IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA17-675 and COA17-1344

 Filed: 18 September 2018

Rowan County, No. 12 CvD 2654

CELINA QUEVEDO-WOOLF, Plaintiff,

 v.

MERRY EILEEN OVERHOLSER and DANIEL CARTER, Defendants.

 ____________________________________

Rowan County, No. 12 CvD 2654

CELINA QUEVEDO-WOOLF, Plaintiff,

 v.

MERRY EILEEN OVERHOLSER and DANIEL CARTER, Defendants.

 Appeal by Plaintiff from order entered 16 May 2016 by Judge Marshall Bickett

and appeal by Defendant Overholser from order entered 17 November 2016 by Judge

James F. Randolph in District Court, Rowan County. Heard in the Court of Appeals

19 February 2018. Appeal by Defendant Overholser from order entered 28 March

2017, nunc pro tunc 14 March 2017, by Judge James F. Randolph in District Court,

Rowan County. Heard in the Court of Appeals 6 August 2018.

 Woodruff Law Firm, PA, by Carolyn J. Woodruff and Jessica Snowberger
 Bullock, for Plaintiff.

 Hoffman Law Firm, PLLC, by James P. Hoffman, Jr., for Defendant
 Overholser.
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 McGEE, Chief Judge.

 I. Factual and Procedural History

 A. General

 Celina Quevedo-Woolf (“Plaintiff”) and Daniel Carter (“Carter”) had a brief

romantic relationship that resulted in the birth of E.R.Q., a girl, on 19 July

2005. Carter has had minimal involvement in E.R.Q.’s life and is not a party to this

appeal. Plaintiff’s mother, Merry Eileen Overholser (“Defendant”) has raised E.R.Q.

since infancy. When Plaintiff realized she was pregnant she moved in with

Defendant, who was living in Defendant’s mother’s house (the “house”), in Palm

Beach County, Florida. After E.R.Q. was born, Plaintiff continued to live with

Defendant. Though E.R.Q. initially slept in Plaintiff’s room, for the majority of the

time Plaintiff and E.R.Q. were living in the house, E.R.Q. slept in Defendant’s room.

 Plaintiff moved out of the house around the time of E.R.Q.’s first birthday,

leaving E.R.Q. with Defendant, because, according to Plaintiff, Plaintiff was not

getting along with Defendant, and for “stability for E.R.Q.” Plaintiff testified she left

E.R.Q. with Defendant because E.R.Q. already “kn[ew] my mother and kn[ew] that

house, [so] it seemed like a logical thing at the time as opposed to me moving out into

a friend’s house, which I did, and [E.R.Q.] not being familiar with the situation or

anything like that.” Plaintiff’s initial apartment was nearby, and Plaintiff testified

 -2-
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

she visited E.R.Q. but that “it was kind of sporadic,” “weekly.” Plaintiff never kept

E.R.Q. overnight during this initial period.

 In order for Defendant to have the authority to make decisions necessary for

raising E.R.Q., such as decisions for medical care, Defendant asked Plaintiff to give

Defendant legal and physical custody of E.R.Q. Plaintiff agreed, and the Circuit

Court of the Fifteenth Judicial Circuit for Palm Beach County, Florida (the “Florida

court”), entered an “Order for Temporary Custody” on 2 November 2006 (the “Florida

Order”), giving sole legal and physical custody of E.R.Q. to Defendant. E.R.Q. was

one year old at the time. The Florida Order allowed Plaintiff to petition for the return

of custody of E.R.Q. to Plaintiff. After Defendant obtained custody, Plaintiff

continued to have semi-regular contact with E.R.Q., but E.R.Q. lived full-time with

Defendant and Defendant made all relevant decisions related to the care of E.R.Q.

In 2007, Defendant filed for, and obtained, an order for child support from Plaintiff.

 In June of 2008, when E.R.Q. was approximately three years old, Defendant

and E.R.Q. moved with Defendant’s girlfriend at the time, Janet Kresge (“Kresge”),

to Rowan County, North Carolina. Defendant had been a special education teacher

since 1984, and continued working in that capacity in North Carolina. Plaintiff

testified she did not want Defendant to leave Florida with E.R.Q., but Defendant

testified that, when she discussed with Plaintiff the idea of moving to North Carolina,

Plaintiff “thought it was a great idea and [Plaintiff] said she was coming” to North

Carolina to be near E.R.Q. Plaintiff did not move to North Carolina, and did not visit

 -3-
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

E.R.Q. in Rowan County until October 2008, when Defendant purchased Plaintiff a

plane ticket for that purpose. A note written by Kresge concerning that time period

stated:

 April, 2008. Discussed moving [with Plaintiff]. Better
 standard of living, et cetera. Was told [Plaintiff] would
 follow in a few months. Looked for apartments. Sent info
 to [Plaintiff]. October, 2008 visit [–] three days. [Plaintiff]
 [s]pent most of time on computer or phone. Did not spend
 . . . quality time [with E.R.Q.]. Promised to be back for
 Thanksgiving. No contact.

Defendant testified that, based upon her own observations, what Kresge had written

in the note was correct. Plaintiff’s next visit with E.R.Q. did not occur until May of

2011, approximately two and a half years after the October 2008 visit. The May 2011

visit was a day visit that lasted only a few hours.

 Defendant testified that she and Kresge offered to let Plaintiff live with them

and E.R.Q., but Plaintiff did not take them up on that offer. Defendant further

testified:

 A After [Plaintiff] came in October [2008] I did not hear
 from her for quite some time.

 Q Was it true that [Plaintiff] didn’t have your phone
 number when you lived in North Carolina?

 A No.

 ....

 Q Do you know where [Plaintiff] was at during that period
 of time when she had no contact?

 -4-
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

A No, I don’t.

Q When you say no contact, do you mean no phone calls, no
visits, or what?

A Correct. There were – there were no visits from – the
next visit did not happen until [3] May, 2011. [Plaintiff]
did call on – there were a couple of Christmases where she
called. I remember one phone call at Christmas time, and
it had been quite a while since I had spoken to her, where
she – she told me that she was suicidal and some other
things, and things surrounding why she felt that
way. There was another phone call. She usually called like
May. May and December. And I remember one May she
called and I said something to her about [E.R.Q.]’s birthday
the previous year. That she never called [E.R.Q.]. And I
said, “Why didn’t you do that? You didn’t even call her?”
And she said, “Mom, honestly I forgot.” And then there was
May of – I believe it was 2010, because [Kresge] was still
there. And we were in the backyard and [Plaintiff] called
and she just started screaming at me, “Give her back to me.
You have to give her back to me. She’s mine. I’m coming to
get [E.R.Q.].” And I said, “[Plaintiff], you don’t even know
her.” And she said, “Well, that’s okay. I’ll come for the
weekend and I’ll spend the weekend with her and then I’m
taking her back with me.” And I said, “No.” And it was
like I had to try to talk her down.

Q So we’re talking about – and I want to make sure I’m
right on this. We’re talking [6] October, 2008, well into
May of 2011 here [that Plaintiff had no physical contact
with E.R.Q.], right?

A Yes.

....

Q Did you go through periods like that where you wouldn’t
hear from [Plaintiff] for a long time and then suddenly you
would get demands to turn [E.R.Q.] over to her?

 -5-
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 A Yes.

 Q Do you even know where [Plaintiff] was living at that
 point in time or who she was living with?

 A No. I know at one point [Plaintiff] told me that she
 married Michael. And I didn’t know – I don’t believe I
 knew specifically where she lived.

 Q Did you know that [Plaintiff had] married a guy – or had
 moved to West Virginia for a while or something, or was
 that later?

 A That was Michael[.] And my recollection is that when we
 had – we had talked about moving – we had all talked
 about moving to North Carolina, and [Plaintiff] said it was
 a great idea and she was all gung-ho. And then – and then
 at that point I’m not sure if they were living – I know for a
 while [Plaintiff and Michael] were living in an apartment.
 For a little while I think they were living with Michael’s
 mother. And we had looked at a house online [for Plaintiff
 in North Carolina]. So . . .

 Q When you say “we looked at a house online,” who looked
 at a house online?

 A [Plaintiff] and I and [Kresge].

 Uncontested findings of fact from the order Plaintiff appeals in this matter –

Judge Marshall Bickett’s 16 May 2016 Custody Order (the “Bickett Order”) – show

that Defendant moved to North Carolina with E.R.Q. in June of 2008, and that

Plaintiff visited E.R.Q. in North Carolina in October of 2008.

 On 1 June 2009, approximately eight months after Plaintiff’s October 2008

visit with E.R.Q. in North Carolina, Plaintiff filed a motion in Florida requesting that

the Florida Order be terminated and that custody of E.R.Q. be returned to Plaintiff.

 -6-
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

In that motion, Plaintiff alleged the following as grounds for regaining custody of

E.R.Q.: “I have maintained steady employment and have proper housing for

[E.R.Q.]. I am also recently married[,]” and that E.R.Q. “would be back with the birth

mother, and [she] would be better off living back in Florida with me and her

immediate family.” Three months later, on 1 September 2009, Plaintiff sent

Defendant an email stating that she wanted to regain custody of E.R.Q. Plaintiff

stated that signing custody of E.R.Q. over to Defendant “was the best thing for

[E.R.Q.] at that time and I don’t regret my decision but [E.R.Q.] belongs with me[.]”

Plaintiff stated that sometimes she felt like Defendant did not love her, “[b]ut when

I think that I always revert back to my past because if you didn’t love me you wouldn’t

support me the way that you did.” Plaintiff stated: “I am not going anywhere and I

have every intention of fighting to get my wonderful daughter home with me.”

 Approximately eight months later, on 4 May 2010, the Florida court entered a

“Notice of Lack of Prosecution” in which it informed Plaintiff that there had been “no

activity” in the action “for a period of 10 months immediately preceding service of this

notice” and that absent some action on the part of Plaintiff to move the matter

forward within sixty days, a hearing would be held on 1 July 2010 “on the court’s

motion to dismiss for lack of prosecution[.]” Plaintiff did not respond to the “Notice

of Lack of Prosecution,” and the Florida court dismissed Plaintiff’s Florida action for

lack of prosecution by order entered 15 July 2010. Plaintiff did not visit E.R.Q.

between the filing and dismissal of the 2009 Florida action.

 -7-
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 In uncontested findings of fact from the Bickett Order, the trial court found as

fact that “[in] October of 2008 [] Plaintiff visited with [E.R.Q.] in the state of North

Carolina. After this visitation, [] Plaintiff stopped visiting with [E.R.Q.],” and that

“during the years 2009 and 2010 [] Plaintiff had no physical contact with [E.R.Q.]”

even though “Plaintiff had the ability to visit with [E.R.Q.] during this period of time.”

Plaintiff testified as follows concerning this period:

 Q Isn’t it true that for a lengthy period of time for more
 than a year back in about 2010, 2011 you didn’t have any
 contact with your daughter at all?

 A No, that’s not true. I tried to call my daughter several
 times.

 Q What’s the longest time you’ve went without seeing or
 talking to your daughter?

 A Seeing her has always been longer. I think there were a
 couple of years where I didn’t see her.

 Q Do you remember when those years were?

 A 2008 – well, no, I think – I believe I saw her in 2008. I
 think maybe 2009 – I saw her in 2010, didn’t I, or – I think
 it was 2009 and 2010 was the years that I didn’t see my
 daughter. (Emphasis added).

 Plaintiff met Jeff Woolf (“Woolf”) in late 2010, and moved to New York in April

2011 to live with him. Plaintiff’s May 2011 visit with E.R.Q. appears to have occurred

by happenstance. Plaintiff was in Charlotte for reasons unrelated to E.R.Q., so she

called Defendant and asked if she could come visit E.R.Q. Defendant agreed, Plaintiff

took a train from Charlotte to Salisbury, and Defendant picked her up. Defendant

 -8-
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

testified that Plaintiff visited with E.R.Q. “for a few hours” then returned to Charlotte

by train. Plaintiff’s description of this visit was that it was “short, but it was fine.”

 Plaintiff and Woolf were married in New York in January 2012, and Woolf

apparently paid for Defendant and E.R.Q. to attend. Plaintiff visited North Carolina

to see E.R.Q. again in 2012, at some time close to E.R.Q.’s July birthday. In the

approximately four-year period between June 2008 and the summer of 2012, Plaintiff

had seen her daughter only four times: three times in North Carolina, and once in

New York. For a brief period in 2011 and early 2012, it appeared that Plaintiff and

Defendant were getting along reasonably well, and Plaintiff was maintaining regular

phone contact with E.R.Q. However, email exchanges between Plaintiff and

Defendant show that by at least May 2012 relations had become seriously

strained. The strain in the relationship between Plaintiff and Defendant was likely

caused or exacerbated by the fact that in May 2012 Plaintiff told Defendant that

Plaintiff was going to regain custody of E.R.Q., move her to Texas to live with Plaintiff

and Woolf, and that Defendant could not prevent that from happening.1

 Defendant, who had naturally developed a very close bond with E.R.Q., was

opposed to Plaintiff’s plan. E.R.Q. was seven years old at this time, and Plaintiff had

not been a consistent or reliable part of E.R.Q.’s life since Plaintiff had moved out of

the house and left E.R.Q. in Defendant’s care when E.R.Q. was one year old. Plaintiff

 1 At this time, Plaintiff and Woolf were living in Texas due to Woolf’s job. By the time of the
Bickett Order, Plaintiff and Woolf had moved to Northern Virginia.

 -9-
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

recounted the 22 May 2012 phone conversation with Defendant concerning Plaintiff’s

desire for custody as follows:

 And [Woolf and I] actually moved into a two bedroom
 apartment, and we knew that we were moving into a two-
 bedroom apartment. And I had reached out to [Defendant],
 and it was the summer. And I had said to her, “You know,
 we’re setting things up for [E.R.Q.] to come live with us,
 and I think it would be a great transition if [E.R.Q.] would
 stay with you the majority of the summer, then come up
 the month before schools starts, and that way we could get
 her into some programs in the area and get her into some
 friends and introduce her to the school and things like that,
 and then we can work on visitation.” And I believe
 [Defendant’s] response was something like over her dead
 body would [E.R.Q.] ever live with me.

Plaintiff emailed Defendant later that same day, stating:

 I want you to know that I love the both of you very much
 and that I hope that you will be able to take the next month
 and a half to two months to help [E.R.Q.] get ready for the
 move. I think that there are some things that we need to
 be on the same page about. But before we get started, there
 is something we need to address. You keep saying that you
 have custody of [E.R.Q.]. Back in 2006, I signed temporary
 custody. I didn’t give up my rights. It was for a specific
 determined amount of time that I can revoke at any time,
 and it was never permanent. I really hope that you can
 take the time with [E.R.Q.] to talk to her about the move
 and all the great things about it such as soccer and getting
 to decorate a new room. I want you to have a relationship
 with your granddaughter. With this move to Texas,
 [E.R.Q.] will be in a great school district. She will be
 involved in all the things she loves like soccer and playing
 the violin. I would really like it if you could talk to her
 about a couple of things that would help her with the move
 such as looking forward to visits with you, camp, a new
 school, and new friends and a whole new place to discover
 and make her own. Just like you asked me not to speak to

 - 10 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 [E.R.Q.] about this and I said I wouldn’t without speaking
 to you first, I expect as you guys have your conversations
 she is going to have some questions for me, and that is
 when I will talk to her about it.

 B. Procedural History for the Appeals in COA17-675

 Plaintiff filed a “Notice of Registration of Foreign Child Custody Order” with

the Clerk of Court, Rowan County, on 25 October 2012, for the purpose of ensuring

that the Florida Order could be enforced by the Rowan County district court (the

“trial court”). N.C. Gen. Stat. § 50A-305 (2017). Plaintiff filed a “Motion in the Cause

for Modification of a Prior Order” (“Plaintiff’s Motion”) on 15 November 2012,

initiating this action (“Plaintiff’s Action”). Plaintiff’s Motion requested that the trial

court modify the Florida Order pursuant to the provisions of the “Uniform Child-

Custody Jurisdiction and Enforcement Act” (“UCCJEA”) and N.C. Gen. Stat. § 50-

13.7 (2017), which allows “upon [the North Carolina court] gaining jurisdiction, and

a showing of changed circumstances, ent[ry of] a new order for custody which modifies

or supersedes” an order originally entered in another state. N.C.G.S. § 50-13.7(b).

 Defendant filed her responsive pleading to Plaintiff’s Motion, Defendant’s

“Motion to Dismiss and for Permanent Custody,” on 8 January 2013. In this motion,

Defendant alleged in part:

 9. . . . . [D]efendant took care of [E.R.Q.] in the evening
 and Plaintiff put her in day care and stayed out and partied
 all night. At some point she just stopped coming home. By
 January 2006 Plaintiff had abandoned child with
 Defendant and “took off.” . . . .

 - 11 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

10. Defendant and [E.R.Q.] moved to North Carolina June
2008[;] prior to that visitation was very sporadic and
Plaintiff never asked to take [E.R.Q.] home, for even a
night. . . . .

11. Defendant filed for custody in Florida in 2006 after
[E.R.Q.] got hurt and she did not know where Plaintiff was
living so [Defendant] could obtain emergency medical
treatment for [E.R.Q.]. In September 2006, Plaintiff gave
[Defendant] a child care power of attorney, but when
Plaintiff stopped coming around at all Defendant requested
that [Plaintiff] consent to a custody order and she agreed
to this. . . . . Plaintiff is in arrears $7,408.06 on child
support and Defendant last obtained child support from
[Plaintiff] last week for $90.00. Plaintiff is supposed to be
paying $90.00 per week. From January 2012 till October
2012 [Plaintiff] paid nothing.

12. Defendant and [E.R.Q.] moved to NC in June 2008 and
Plaintiff was supposed to come with them; however
[Plaintiff] never showed up because she decided to move
with a boyfriend and his mom to West Virginia. [Plaintiff
and her boyfriend] later married and divorced. Plaintiff’s
visits since 2008 were sporadic. In October 2008,
Defendant paid $300.00 for airfare so Plaintiff could visit.
She stayed the weekend and stated she would return for
Thanksgiving however never returned. She did not ask to
take [E.R.Q.] home with her.

13. Defendant has never denied Plaintiff
visitation. [Defendant] has paid for airfare once and even
flew with [E.R.Q.] to New York for Plaintiff’s wedding [to
Plaintiff’s] present husband. Defendant did not hear from
Plaintiff at all for two and one half years and only received
sporadic child support from Plaintiff’s tax returns or
frequently from unemployment compensation.

14. In May 2011, Plaintiff called from Charlotte and
wanted to see [E.R.Q.] [] Defendant agreed. [Plaintiff]
took the train from Charlotte[,] stayed 3 hours[, and] said
she had moved to NYC. [Plaintiff] did not ask to stay and

 - 12 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

went back to Charlotte. [E.R.Q.] asked her to stay and
[Plaintiff] was invited and did not stay. [Plaintiff and
E.R.Q.] started talking more and Defendant started
call[ing] every weekend and was pretty consistent. In
November 2011, [] Defendant asked Plaintiff to come for
Christmas and [Plaintiff] did [and] she stayed 3 days, then
Plaintiff invited Defendant and [E.R.Q.] to NYC to her
wedding in January 2012. . . . . The parties had a good
time but they only got to see Plaintiff for small intervals
over the weekend.

15. Plaintiff and [Woolf] moved to Texas in May . . . of 2012
and Plaintiff sent an email that they were moving to Texas
and said “we are taking [E.R.Q.] with us and you need to
take the next 4 to 6 weeks to prepare her.” [] Plaintiff also
told [Defendant] that the Florida Order was temporary,
that [Plaintiff] could revoke it at any time and that
Defendant had violated the [Florida] Order when she
moved. Plaintiff also told Defendant that “unless
[Defendant] cooperated, that she would never see [E.R.Q.]
again.” By November 2012, the pending motion was filed.

....

18. Defendant is a fit and proper person to continue to have
sole care custody and control of [E.R.Q.] in that:

 a. [E.R.Q.] is now seven years old and has never lived
 with anyone else other than [Defendant] and that this
 is the status quo for [E.R.Q.]

 b. [] Defendant is highly educated and gainfully
 employed in the Cabarrus County School System as a
 Resource and Inclusion teacher for Disabled and
 Special Needs Children with a BS in Special
 Education. [E.R.Q.]’s condition is causing some
 learning issues and she is especially qualified to care for
 [E.R.Q.]

 c. [] Defendant has for the past seven years successfully
 cared, support and loved [E.R.Q.] with scant help or

 - 13 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 contact with the Plaintiff or the biological father,
 keeping a roof over her head, food in her stomach and
 dealing with a dangerous medical condition. [E.R.Q.] is
 happy, relatively healthy other than [what] has been
 stated and well-adjusted and making excellent progress
 in school.

 d. That a move at the age of seven years old to a mother
 that she does not really even know would likely be
 traumatic to [E.R.Q.] and not be in her best interests.

Defendant requested, inter alia, that the trial court award Defendant permanent

custody of E.R.Q., and grant Plaintiff supervised visitation with E.R.Q.

 Plaintiff and Defendant entered into an agreement, which was then entered by

the trial court as a “Temporary Consent Order,” on 1 May 2013. This order

determined that “it [wa]s in the best interests of [E.R.Q.], pending further hearing in

the matter, that Defendant [] maintain primary legal and physical custody of

[E.R.Q.].” The order further granted Plaintiff rights of visitation, information

sharing, and contact that were not provided for in the Florida Order. Although the

May 2013 order did not grant Plaintiff the right to overnight visits with E.R.Q.,

Defendant apparently independently consented to allow E.R.Q. to visit Plaintiff in

Virginia in October of 2014. This 2014 visit was the first time E.R.Q. had an

overnight visit with Plaintiff without Defendant’s supervision in over six years. A

temporary order was entered on 5 November 2014 officially granting Plaintiff multi-

day unsupervised visitation with E.R.Q., on specific dates, at Plaintiff’s home in

Virginia .

 - 14 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 The hearing on Plaintiff’s motion to modify the Florida Order commenced on 3

March 2015, Judge Bickett presiding, continued over ten non-consecutive days until

16 July 2015, and included the testimony of many witnesses. At the end of that

hearing, Judge Bickett expressed his concern about the apparent animus between

Plaintiff and Defendant, and between their counsel. The following exchange occurred

between Judge Bickett and Plaintiff’s attorney concerning how Plaintiff had argued

her case:

 BY THE COURT: I mean, you and [Plaintiff] . . . have filed
 a motion to register the [Florida Order] and ask that it be
 modified based upon substantial change of circumstances.
 And now you’re here saying, well, best interest controls and
 substantial change of circumstances doesn’t control.

 BY MR. CAMERON: Well, I don’t think I’ve necessarily
 . . . said that. I think there has been a substantial change
 in circumstances affecting the welfare of the minor child.
 And I think . . . coupled with that, the best interests are
 that she needs to be with [Plaintiff].

Judge Bickett stated:

 I have no clue as to what I’m going to do still. I’m going to
 have to go back and read my notes and – I mean, I do know
 that you – that with your permission I talked to [E.R.Q.] in
 chambers and she expressed a preference as she wants to
 keep things the way they are. And I do know the suicide
 scares me to death. I mean, and you all presented
 absolutely minimal evidence as to that and that should
 have been one of the most important aspects of this case is
 what’s going to happen to her if I move her. I mean, and
 you all just sort of, “Oh, no. It’s no big deal there.” It scares
 me to death.

 - 15 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

Judge Bickett decided to continue the matter until 30 July 2015. A proceeding was

held on 30 July 2015. In this hearing, Judge Bickett recounted some of the evidence

before him, and discussed his concerns that, despite the lengthy trial, the parties had

failed to focus on the relevant issues — change of circumstances and best interest of

E.R.Q.:

 [F]or me to modify [the Florida Order], there has to be a
 material and substantial change of circumstances affecting
 the welfare of [E.R.Q.]. And you have to show that it’s in
 the best interest of [E.R.Q.]. There’s been marginal
 evidence, at best, on affecting the welfare of the child. And
 there’s been less evidence on best interest. I mean, this has
 all been about “what is best for me,” not what is best for
 this young child. However, and [Defendant’s attorney] Mr.
 Paris’s argument that this is the second motion with
 basically the same allegations – I’ve got a new husband,
 I’ve got a new job, and I’m stable – I am going to find that
 there is substantial change of circumstances affecting the
 welfare of the child. It concerns me deeply that – as I said
 before, that this young lady came in and testified that she
 liked being with [Defendant] and that there is evidence of
 suicidal ideation or some type of psychological problem that
 you all just didn’t bother to think should be a part of this
 trial, to the extent, I think the best interest is the most
 important portion of this trial, and you all just sort of –
 even though you took – this is probably one of the longest
 trials we’ve had in this county in the last ten years I’ve
 been a judge – you just have ignored best interest. So I’m
 going to do a temporary order. I’m going to make a finding
 that this is a high-conflict case and that both parents – both
 [Plaintiff] and [Defendant] have the means to pay for a
 parenting coordinator. I’m going to appoint Mary Blanton
 as a parenting coordinator. . . . . I think [E.R.Q.’s]
 relationship with [Plaintiff] needs to be repaired, and I
 think I would like nothing better [than] to give custody
 back to [Plaintiff]. But, ma’am [Plaintiff], Mr. Cameron
 [Plaintiff’s attorney] argued that I should treat this as a

 - 16 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 juvenile case. If this was a neglect and abuse case, I would
 have terminated your parental rights eight years ago, or
 seven years ago. Because the key in that court is
 permanency. The child has to have a permanent plan.
 [Y]ou do one year of trying to repair things and get the
 relationship back with the mother, and if that doesn’t work
 out, then you terminate rights and give the child to a
 parent or a person that will give the child some type of
 stability and permanency. And the only permanency
 [E.R.Q.] has had is with [Defendant]. Now, it concerns me
 that you all do not like each other, or you all are not getting
 along. I don’t know that I can fix that, but we need to look
 at what’s best for your daughter, and your granddaughter.
 And I don’t – I think pulling her out of [Defendant]’s house
 when she expressed a preference, and when there’s
 psychological issues that I don’t know what they are. I do
 know that a ten-year-old, if you force her to do something,
 is going to do something drastic to do whatever she wants
 to do. And this young lady is a very smart young lady. I
 just don’t want her to do something bad. I don’t have
 confidence that you all can work it out between yoursel[ves]
 because you haven’t done that because of the animosity
 that you have. But I do feel confident that we can do
 something, if you want your relationship repaired, to repair
 it. And then if you get it repaired, then I can look at best
 interest, and if – it may be in her best interest that she go
 back to you [Plaintiff]. But I don’t know that now because
 you all – because of the evidence that’s been presented.

 Judge Bickett entered his first order in this matter on 30 July 2015, the same

day as the proceeding. This temporary order was limited to visitation, stated that

the “merits of this case are still pending, with the next hearing date to be scheduled

in February or March, 2016[,]” and further stated that the order was “entered without

any prejudice to either party.” On 24 February 2016 Judge Bickett entered a second

order based on the 30 July 2015 proceeding, in which he made findings and

 - 17 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

conclusions expressing the same concerns he had discussed at the proceeding, ruled

that a parenting coordinator should be appointed, granted Plaintiff more access to

E.R.Q., and left the matter open for further action. Judge Bickett made no conclusion

in this order that there had been any change in circumstances affecting the welfare

of E.R.Q.

 The next hearing was conducted on the same day the 24 February 2016 order

was entered. In this 24 February 2016 hearing, Plaintiff testified that she would like

“the judge to allow [E.R.Q.] to come live with [Plaintiff] as soon as today[.]” Over

Plaintiff’s objection, E.R.Q., then approaching eleven years old, testified. E.R.Q. was

clearly nervous initially, and Plaintiff and Defendant agreed to leave the courtroom

so E.R.Q. would not have to answer questions in front of them. Judge Bickett

attempted to calm E.R.Q., and let her know that her testimony was not going to

determine with whom she was going to live. Judge Bickett told E.R.Q. he was “just

trying to figure out what is best for you, and I’m trying to figure out a way for you to

have a better relationship with [Plaintiff]. But . . . I want to find out just what you

want. Okay?” E.R.Q. responded: “I want to live in North Carolina.” E.R.Q. explained

a number of the reasons she preferred to remain in North Carolina. When asked

about her visits with Plaintiff, E.R.Q. testified that the visits went “[g]ood. I don’t

know why, but I always end up angry at the end.” E.R.Q. testified that she would be

happy to have more time to visit Plaintiff over the summer, but when Judge Bickett

inquired: “Tell me, you used to not have a relationship with your mom. Do you like

 - 18 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

having one?” E.R.Q. responded: “Yes. But I think she pushed it too far when she put

it in court.” E.R.Q. testified that the reason she does not talk with Plaintiff on the

phone sometimes is that she has a lot of schoolwork and is otherwise busy, or because

she has fallen asleep. She testified that Defendant never prevents her from talking

to Plaintiff.

 E.R.Q. testified that she is sometimes sad to leave Virginia because she has

“such a good time” in Virginia. She stated that Plaintiff and Woolf “buy a lot of stuff

for” her, and that her bicycle in North Carolina was broken. However, when asked if

she was “getting as much time with [Plaintiff] as you want for right now,” E.R.Q.

answered: “Yes.” When asked how her life was going at Defendant’s house, E.R.Q.

answered: “Good. I love it there. The only thing is that Henry [her dog] is wild. I

love that dog though.” When asked if it seemed that Defendant had less money than

Plaintiff, E.R.Q. answered: “I’ve never cared or thought of that.” E.R.Q. testified that

she gave Defendant a necklace that was “a diamond crusted heart [that] says

‘Mom[,]’” which she bought with money she earned and quarters she finds “laying on

the ground my mom [Defendant] leaves there on purpose.” E.R.Q. testified that she

calls both Defendant and Plaintiff “mom,” and that she was “lucky to have two

moms.” She reflected on having two moms, saying: “Oh, it’s been the same since –

when [Kresge] was around, and I didn’t even know [Plaintiff], I had two

 - 19 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

moms. [Kresge] left, then I get [Plaintiff]. Two moms.”2 When asked if she would

have any problems if the trial court decided she would have to live with Plaintiff and

go to school in Virginia, E.R.Q. answered: “It would take me about three years to

adjust to that, because that’s how long it took me to make all my friends from

Salisbury.” E.R.Q. explained that she believed “[Defendant] and [Plaintiff] need to

communicate more.” Finally, E.R.Q. testified: “I love both my mothers equally.”

 Judge Bickett expressed concerns over “nuances to family law that you all

haven’t really argued here that really worried me to death on this case.” Recognizing

that, pursuant to N.C.G.S. § 50-13.7, he first had to find a change of circumstances

affecting the welfare of E.R.Q., and only then consider the best interests of E.R.Q.,

Judge Bickett asked: “If I find that hasn’t happened[3] then it reverts – then I dismiss

your action. If I do that, what does it do to the temporary orders that are entered?”

Defendant’s attorney stated that he thought all the visitation orders would be “gone”

if the trial court denied Plaintiff’s underlying motion to modify custody pursuant to

N.C.G.S. § 50-13.7. Judge Bickett responded:

 I think they’re gone, too. I mean, you all aren’t – aren’t
 conversing. I mean, it’s obvious [E.R.Q.] expressed a
 preference. . . . . From 2005 to 2010 . . . [Plaintiff] was
 pretty much nonexistent. As I said from the last time,
 there are at least three grounds under North Carolina law
 where I could terminate [Plaintiff’s parental] rights, and I
 would have terminated her rights if it were a neglect
 case. It’s also, you know, since 2012 when she filed this

 2 The relationship between Defendant and Kresge ended sometime before Plaintiff filed this
action, and Kresge moved out of the house.
 3 That the requirements for modification pursuant to N.C.G.S. § 50-13.7 had not been met.

 - 20 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 lawsuit she’s been totally in. I mean, she’s really been
 doing what she’s supposed to do. But a child needs
 permanency. They need to have the same thing from day
 to day and [Plaintiff] hasn’t done that. I mean, she’s gotten
 – she’s very involved now. I’m going to take it under
 advisement. I need to figure out how to structure an order
 that is in [E.R.Q.’s] best interest. I mean, I could easily say
 your motion’s denied and then I don’t know where we’re
 left. I don’t think that it is in [E.R.Q.’s] best interest that
 she not have a strong relationship with her mother, and
 that’s what I was trying to do. That’s why I tried to do this
 order to get you more and more time with her so to develop
 a strong relationship and to do something over the summer
 where your client had extended time with her. But
 obviously you []all didn’t want that. So I’ll make a decision
 and I’ll figure out how I can do my order. But I need to
 think about it and reread some of the North Carolina law
 to figure out how I can structure an order that will help her
 in the best interest. And I’m not exactly sure based upon
 the pleadings and what you all are asking for how I can do
 that. But I’ll figure it out. (Emphasis added).

From Judge Bickett’s remarks at the hearing, it appears to this Court that his opinion

at that time was that Plaintiff had not met her burden under N.C.G.S. § 50-13.7, but

that he did not believe E.R.Q.’s best interest would be met if the result of denial of

Plaintiff’s motion to modify custody might lead to Plaintiff losing all visitation rights,

so he was going to review the relevant law and try and find a way to preserve

visitation between Plaintiff and E.R.Q.

 Plaintiff filed a motion in the cause on 22 April 2016 seeking to be allowed to

present additional evidence to the trial court, and seeking a show cause order against

Defendant for violating terms of the 1 May 2013 temporary consent order. A hearing

was conducted on 12 May 2016, but Plaintiff’s motions were not considered because

 - 21 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

Defendant’s attorney informed the trial court that he no longer had a working

relationship with Defendant, and Judge Bickett continued the matters because he

would not proceed on Plaintiff’s motion’s if Defendant did not have appropriate

representation. The following day, 13 May 2016, Plaintiff filed a “Motion for Mistrial

and Motion for Recusal,” arguing, inter alia, that Judge Bickett demonstrated bias

against Plaintiff during the prior hearings and had not acted in a timely fashion to

the prejudice of Plaintiff. Plaintiff also argued that, during the 24 February 2016

hearing, “immediately after issuing a written order that stated that Plaintiff had

shown a substantial change of circumstances . . . Judge Bickett announced that there

had been no substantial change of circumstances.” Review of both the 24 February

2016 order and the 24 February 2016 hearing show that Judge Bickett did not reach

a conclusion on the issue of substantial change of circumstances affecting the welfare

of E.R.Q. in either the order or the hearing. Plaintiff also stated in her motion that

she was filing a complaint against Judge Bickett with the North Carolina Judicial

Standards Commission. Plaintiff requested that a mistrial be declared in the matter,

and that “a new judge be appointed to hear the merits of the case[.]”

 Judge Bickett entered the custody order from which Plaintiff currently appeals

– the Bickett Order – on 16 May 2016. The Bickett Order concluded that Plaintiff

had “failed to meet her burden to show that there has been a substantial and material

change of circumstances affecting the welfare of” E.R.Q., and that Plaintiff had “acted

inconsistently with her constitutionally protected status to parent her child[.]” Judge

 - 22 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

Bickett denied Plaintiff’s Motion to modify the Florida Order, and Plaintiff’s Action

was dismissed.

 Plaintiff filed a “Motion for a New Trial” pursuant to N.C. Gen. Stat. § 1A-1,

Rule 59 (2017), on 23 May 2016. Plaintiff filed an affidavit from Florida attorney

Craig A. Boudreau (“Boudreau”) on 22 August 2016, in which Boudreau cited to

provisions of Florida law – including Florida’s UCCJEA statutes – that Boudreau

suggested demonstrated jurisdiction had remained with the Florida court. Boudreau

further contended a Florida statute, not N.C.G.S. § 50-13.7, should have determined

the proper standard to apply when considering whether to modify the Florida Order.

The Boudreau affidavit appears to be the first record evidence challenging North

Carolina’s jurisdiction to act in Plaintiff’s Action, and the first indication that

Plaintiff was going to argue that Florida law controlled the outcome in Plaintiff’s

Action. Plaintiff’s new argument was that the sole relief Plaintiff had requested in

this matter4 – modification of the Florida Order based upon a change of circumstances

as required by N.C.G.S. § 50-13.7 – was not justified under the law.

 A new judge, Judge James Randolph (“Judge Randolph”), became involved in

the case by at least 24 August 2016, as the record demonstrates that he presided over

a hearing on that date. Judge Bickett recused himself from the matter by order

 4 By filing her 15 November 2012 “Motion in the Cause for Modification of a Prior Order,”
which initiated the present action, and by arguing, exclusively, over years of litigation and many days
of hearings, that Plaintiff had met the requirements of N.C.G.S. § 50-13.7 for modification of the
Florida Order.

 - 23 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

entered 6 September 2016. If the 24 August 2016 hearing was recorded, it has not

been included in the record, though we note that this hearing occurred after Plaintiff

had filed her Rule 59 motion and the Boudreau affidavit, and therefore subsequent

to the time Plaintiff alleges that she became aware that North Carolina had never

obtained jurisdiction in this matter. Judge Randolph entered a temporary custody

order on 7 September 2016, based upon the 24 August 2016 hearing, in which he

concluded that the trial court had subject matter jurisdiction, North Carolina was

E.R.Q.’s home state, and in which he ordered certain specific visitation provisions.

This order did not acknowledge any jurisdictional or choice of law concerns raised by

Plaintiff.

 Plaintiff’s Rule 59 motion for a new trial was heard on 7 September and 19

October 2016.5 The order from which Defendant appeals was entered by Judge

Randolph on 17 November 2016 (the “Randolph Order”). In the Randolph Order, the

trial court addressed the new arguments raised by Plaintiff involving jurisdiction and

Florida law. Judge Randolph ruled that the trial court had never obtained subject

matter jurisdiction pursuant to UCCJEA requirements, and therefore, effectively,

that all prior orders entered by the trial court were void. However, the trial court

included conclusions of law unrelated to subject matter jurisdiction, namely: “The

[trial court] finds that there exist sufficient grounds under North Carolina Rules of

 5 Only the transcript for 7 September 2016 appears in the record.

 - 24 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

Civil Procedure Rule 59 to warrant a new trial, if this [c]ourt obtains subject matter

jurisdiction. This [c]ourt should give Full Faith and Credit to Florida law.” Based

upon its findings and conclusions, the trial court ordered:

 1. Plaintiff’s Motion for New Trial is granted, if Florida
 releases subject matter jurisdiction to North Carolina.

 2. [That Judge Randolph would contact the appropriate
 judge in Florida to seek release of jurisdiction.]

 ....

 4. As the [Florida Order] originated in Palm Beach County,
 Florida, Florida law applies to the interpretation of said
 order.

 Following entry of the Randolph Order, the trial court entered a “Formal Order

from Consent Judgment/Order” on 13 December 2016, in which it modified a

visitation provision of the 7 September 2016 temporary custody order. Defendant

filed notice of appeal from the Randolph Order on 16 December 2016. Plaintiff filed

notice of appeal from the Bickett Order on 19 December 2016.

 C. Procedural History for Appeal in COA17-1344

 Plaintiff filed a “Verified Motion in the Cause to Terminate Order for

Temporary Custody” on 4 January 2017 (the “Verified Motion”), under the same case

number assigned to Plaintiff’s prior action. In that motion, Plaintiff requested that

the trial court make a determination that Plaintiff was “a fit parent and able to

assume all parental responsibilities” for E.R.Q. and thereupon order the Florida

Order “be terminated pursuant to Ch. 751.05(6), Florida Statutes.” The Florida court

 - 25 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

entered an order purporting to “transfer” jurisdiction to North Carolina on 21

February 2017. A hearing was conducted on the Verified Motion on 14 March 2017.

The trial court entered a “Child Custody Order” on 28 March 2017 (the “2017 Order”)

in which it found that the “State of Florida . . . transferred jurisdiction of this child

custody matter to the State of North Carolina” on 21 February 2017. The trial court,

applying Florida law, concluded that Plaintiff was “a fit parent” and “a proper person

to assume legal and physical custody of” E.R.Q. Based upon these findings, the trial

court “ordered, adjudged and decreed” that the Florida Order was terminated; that

the 2017 Order “supersedes and vacates all other North Carolina Orders in this court

file[;]” that “Plaintiff shall have legal and physical custody of” E.R.Q., and that E.R.Q.

“shall transition to live with Plaintiff [] in Herndon, Virginia” on 2 April 2017. No

provisions for visitation between E.R.Q. and Defendant were included in the 2017

Order. Defendant appealed the 2017 Order on 27 April 2017.

 II. Appeal in COA17-675

 A. Plaintiff’s Appeal

 1. Appellate Jurisdiction

 As an initial matter, we must determine whether this Court has jurisdiction to

consider Plaintiff’s appeal. Plaintiff’s notice of appeal from the 16 May 2016 Bickett

Order was filed on 19 December 2016, well beyond the thirty-day requirement set

forth in Rule 3(c)(1). N.C. R. App. P. 3(c)(1). Therefore, the timeliness of Plaintiff’s

appeal hinges upon whether Plaintiff’s 23 May 2016 “Motion for New Trial” pursuant

 - 26 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

to Rule 59 served to toll the thirty-day period as allowed by Rule 3(c)(3). See Batlle

v. Sabates, 198 N.C. App. 407, 413, 681 S.E.2d 788, 793 (2009). In Smith v. Johnson,

125 N.C. App. 603, 481 S.E.2d 415 (1997), this Court dismissed the defendants’ appeal

based upon the following reasoning:

 To qualify as a Rule 59 motion within the meaning of Rule
 3 of the Rules of Appellate Procedure, the motion must
 “state the grounds therefor” and the grounds stated must
 be among those listed in Rule 59(a). N.C.G.S. § 1A-1, Rule
 7(b)(1) (1990); N.C.G.S. § 1A-1, Rule 59(a) (1990); see
 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
 Federal Practice and Procedure: Civil 2d § 2811, at 132
 (1995) (motion that “does not sufficiently state grounds has
 been treated as a nullity and ineffective” for extending time
 for taking appeal). The mere recitation of the rule number
 relied upon by the movant is not a statement of the grounds
 within the meaning of Rule 7(b)(1). The motion, to satisfy
 the requirements of Rule 7(b)(1), must supply information
 revealing the basis of the motion.

 In this case the defendants indicate in the motion that they
 rely on Rule 59(a)(2) & (7) as the bases of their
 motion. There are, however, no allegations in the motion
 revealing any “[m]isconduct of the jury or prevailing party,”
 N.C.G.S. § 1A-1, Rule 59(a)(2), or an “[i]nsufficiency of the
 evidence to justify the verdict or that the verdict is contrary
 to law.” N.C.G.S. § 1A-1, Rule 59(a)(7).

Smith, 125 N.C. App. at 606, 481 S.E.2d at 417 (citations omitted) (emphasis added);

see also Meehan v. Cable, 135 N.C. App. 715, 721, 523 S.E.2d 419, 423 (1999).

 Plaintiff’s purported Rule 59 motion included bare allegations of errors

pursuant to Rule 59(a), but did not allege any actual conduct that would support any

of those bare allegations of error. For example, Plaintiff’s motion alleged: “Plaintiff

 - 27 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

moves pursuant to Rule 59 . . . for a new trial on Plaintiff’s Motion to Change Custody

because . . . [of] insufficiency of evidence to justify the verdict, the verdict is contrary

to law, errors in law occurring at trial and objected to by [] Plaintiff[.]” However,

Plaintiff’s purported Rule 59 motion included “no allegations in the motion revealing

. . . an ‘[i]nsufficiency of the evidence to justify the verdict or that the verdict is

contrary to law[,]’” or any error of law objected to by Plaintiff. Smith, 125 N.C. App.

at 606, 481 S.E.2d at 417 (citation omitted). Plaintiff’s motion, by simply reciting

statutory language, included nothing more than bald allegations that certain

statutory grounds existed – specifically those included in Rule 59(a)(1), (3), (4), (7),

and (8). Plaintiff’s mere recitation of grounds laid out in Rule 59(a) was insufficient

to “qualify [her motion] as a Rule 59 motion within the meaning of Rule 3 of the Rules

of Appellate Procedure[.]” Id. (citations omitted). To the extent the Boudreau

affidavit included allegations relevant to Plaintiff’s Rule 59 motion, those allegations

were not part of Plaintiff’s Rule 59 motion because the affidavit was not filed until 22

August 2016, and was not incorporated into Plaintiff’s motion. N.C.G.S. § 1A-1, Rule

59(c).

 Because Plaintiff’s 23 May 2016 motion did not qualify as a motion for a new

trial pursuant to Rule 59, its filing did not toll the time Plaintiff had to file her notice

of appeal from the 16 May 2016 Bickett Order and, therefore, Plaintiff’s 19 December

2016 Notice of Appeal was not timely filed. N.C. R. App. P. 3(a)(1); Smith, 125 N.C.

 - 28 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

App. at 606, 481 S.E.2d at 417. Absent a timely filed notice of appeal, this Court is

without jurisdiction to consider Plaintiff’s appeal. Id.

 Although a lack of subject matter jurisdiction normally precludes an appellate

court from considering the merits of an appeal, there is an exception when the lack of

jurisdiction is based on failure to timely file a notice of appeal. “Our appellate courts

have explained on multiple occasions that ‘[n]o appeal lies from an order of the trial

court dismissing an appeal for failure to perfect it within apt time, the proper remedy

to obtain review in such case being by petition for writ of certiorari.’” Am. Mech., Inc.

v. Bostic, 245 N.C. App. 133, 137, 782 S.E.2d 344, 346, disc. review denied, __ N.C. __,

784 S.E.2d 472 (2016) (citations omitted). Plaintiff has not petitioned this Court for

review pursuant to writ of certiorari. However, we chose to treat Plaintiff’s appeal

as a petition for writ of certiorari, and address her arguments. See Anderson v.

Hollifield, 345 N.C. 480, 482, 480 S.E.2d 661, 663 (1997).

 2. Plaintiff’s Arguments

 Plaintiff argues three issues on appeal from the Bickett Order: (1) that the trial

court “erred by entering the [Bickett] Order as the [trial] court lacked subject matter

jurisdiction;” (2) that the trial court “erred by applying North Carolina law, rather

than Florida law in its custody order;” and (3) that the trial court “abused [its]

discretion by finding and concluding as a matter of law that Plaintiff [] had ‘engaged

in conduct inconsistent with her constitutionally protected status of a parent.’” We

address each argument in turn, and affirm the Bickett Order.

 - 29 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 a. Subject Matter Jurisdiction

 Plaintiff first argues that Judge Bickett lacked jurisdiction to enter the Bickett

Order. We disagree.

 The UCCJEA and the Parental Kidnapping Prevention Act (“PKPA”) control

whether courts of this State have jurisdiction to modify custody determinations

entered by courts of another state. See N.C. Gen. Stat. §§ 50A-201 to 210 (2017); 28

U.S.C.A. § 1738A. It is the continuing duty of this Court to insure, even sua sponte,

that the trial court had subject matter jurisdiction in every action it took. Although

Plaintiff makes no argument concerning the PKPA, we have determined that the

provisions of the PKPA were met in the present case. Plaintiff argues, however, that

the jurisdictional requirements of the UCCJEA were not met prior to entry of the

Bickett Order.

 Although Plaintiff bases her argument on a different statute, the requirements

for obtaining jurisdiction to modify a custody order entered in another state are found

in N.C.G.S. § 50A-203 – “Jurisdiction to modify determination”:

 Except as otherwise provided in G.S. 50A-204, a court of
 this State may not modify a child-custody determination
 made by a court of another state unless a court of this State
 has jurisdiction to make an initial determination under
 G.S. 50A-201(a)(1) or G.S. 50A-201(a)(2) and:

 (1) The court of the other state determines it no longer
 has exclusive, continuing jurisdiction under G.S. 50A-
 202 or that a court of this State would be a more
 convenient forum under G.S. 50A-207; or

 - 30 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 (2) A court of this State or a court of the other state
 determines that the child, the child’s parents, and any
 person acting as a parent do not presently reside in the
 other state.

N.C.G.S. § 50A-203 (emphasis added).

 Pursuant to N.C.G.S. § 50A-201, a court of this State has jurisdiction to enter

an initial custody determination if “[t]his State is the home state of the child on the

date of the commencement of the proceeding[.]” N.C.G.S. § 50A-201(a)(1). In a 1 May

2013 “Temporary Consent Order,” the trial court found and concluded, that “North

Carolina is the home state of [E.R.Q.] . . . and none of the parties to this action

presently reside in the state of the Prior Order [Florida].” (Emphasis added). Plaintiff

does not dispute either of these findings, and they are supported by the facts in this

case. It is uncontested that North Carolina is the “home state” of E.R.Q. and,

therefore, that the trial court had “jurisdiction to make an initial determination

under G.S. 50A-201(a)(1)[.]” N.C.G.S. § 50A-203. The trial court correctly

determined that none of the relevant persons – E.R.Q., Plaintiff, Defendant, or Carter

– were residents of Florida at any time relevant to our jurisdictional analysis, which

satisfies N.C.G.S. § 50A-203(2). Because both conditions for modification jurisdiction

pursuant to N.C.G.S. § 50A–203(2) were met, the trial court had jurisdiction to

consider Plaintiff’s Action to modify the Florida Order, and to enter the various

visitation and other orders entered in relation to the issue of E.R.Q.’s custody,

 - 31 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

including the Bickett Order. In re J.H., 244 N.C. App. 255, __, 780 S.E.2d 228, 235–

38 (2015).

 Plaintiff, however, argues that the Florida court had “exclusive, continuing

jurisdiction” (“ECJ”) pursuant to N.C.G.S. § 50A-202 until the Florida court released

jurisdiction to North Carolina. Plaintiff is correct that a court with ECJ over a

custody matter is the only court with jurisdiction to act in that matter. 6 See, e.g.,

Matter of T.E.N., __ N.C. App. __, 798 S.E.2d 792 (2017). However, if the

requirements for modification of a custody determination from another state

pursuant to N.C.G.S. § 50A-203 are met, ECJ for that state will have ceased pursuant

to the terms of N.C.G.S. § 50A-202. Relevant to this appeal, Florida lost ECJ because

the trial court in North Carolina “determine[d] that [E.R.Q.], [E.R.Q.]’s parents, and

[Defendant] d[id] not presently reside in [Florida]” at any time relevant to Plaintiff’s

Action. N.C.G.S. § 50A-202(a)(2). Matter of T.E.N., __ N.C. App. at __, 798 S.E.2d at

794; In re E.J., 225 N.C. App. 333, 336, 738 S.E.2d 204, 206 (2013); In re N.R.M.,

T.F.M., 165 N.C. App. 294, 298–301, 598 S.E.2d 147, 149–51 (2004).

 Plaintiff also argues that Defendant’s relocation to North Carolina violated a

Florida statute and thereby caused jurisdiction to remain with the Florida

court. When Defendant moved to North Carolina in July of 2008, violation of the

 6 With the exception of temporary emergency jurisdiction, which may be exercised by a court
without ECJ when a child’s welfare requires immediate action. N.C.G.S. § 50A-204.

 - 32 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

statute in question, Fla. Stat. § 61.13001(3)(f) (2007), “subject[ed] the party in

violation thereof to contempt and other proceedings to compel the return of the

child[.]” Id.7 Nothing in the Florida statute itself served to deprive the trial court of

jurisdiction in this case. The provisions of the UCCJEA relevant to Plaintiff’s

argument state:

 (a) Except as otherwise provided in G.S. 50A-204 or by
 other law of this State, if a court of this State has
 jurisdiction under this Article because a person seeking to
 invoke its jurisdiction has engaged in unjustifiable
 conduct, the court shall decline to exercise its jurisdiction
 unless:

 (1) The parents and all persons acting as parents have
 acquiesced in the exercise of jurisdiction[.]

N.C.G.S. § 50A-208. Even assuming, arguendo, Defendant was a “person seeking to

invoke” jurisdiction in North Carolina, and that she engaged in “unjustifiable

conduct” by moving with E.R.Q. to North Carolina, Plaintiff clearly acquiesced to the

jurisdiction of this State by registering the Florida Order in North Carolina, and by

filing her action here. Id. None of the orders entered prior to the Randolph Order,

including the Bickett Order, were void for lack of subject matter jurisdiction.

 b. Choice of Law and Full Faith and Credit

 7 This portion of the statute has since been amended.

 - 33 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 Plaintiff argues that the trial court failed to afford full faith and credit to the

Florida Order, and “erred by applying North Carolina law, rather than Florida law

in” the Bickett Order. We disagree.

 i. Child Custody Law in North Carolina and Florida

 We first note that in North Carolina, as in Florida, trial courts are given very

broad discretion in child custody matters – whether initially or upon a request for

modification of a prior custody order – based upon the universal principle that the

best interest of the child shall remain paramount. See Shipman v. Shipman, 357

N.C. 471, 474, 586 S.E.2d 250, 253 (2003) (citations omitted) (“As in most child

custody proceedings, a trial court’s principal objective is to measure whether a change

in custody will serve to promote the child’s best interests. Therefore, if the trial court

does indeed determine that a substantial change in circumstances affects the welfare

of the child, it may only modify the existing custody order if it further concludes that

a change in custody is in the child’s best interests.”); Castillo v. Castillo, 950 So. 2d

527, 528 (Fla. Dist. Ct. App. 2007) (citations omitted) (“The trial court exercises broad

discretion in making a child custody determination, and its decision is reviewed for a

clear showing of an abuse of discretion. . . . . ‘Decisions affecting child custody

require a careful consideration of the best interests of the child.’”). This Court “has

often reiterated that the jurisdiction of the court to protect infants is broad,

comprehensive and plenary.” Massey v. Massey, 121 N.C. App. 263, 268–69, 465

S.E.2d 313, 316 (1996) (citations and quotation marks omitted). “Any judgment

 - 34 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

entered by consent or otherwise, determining the custody and maintenance of minor

children, may be modified by the court at any time changed conditions make a

modification right and proper.” Zande v. Zande, 3 N.C. App. 149, 153–54, 164 S.E.2d

523, 527 (1968) (citations omitted); see also In re Marlowe, 268 N.C. 197, 199, 150

S.E.2d 204, 206 (1966); Reed v. Reed, 182 So. 3d 837, 840-41 (Fla. Dist. Ct. App.

2016). Under both North Carolina and Florida law generally, the provisions of a

custody order remain susceptible to modification based upon a substantial change of

circumstances affecting the welfare of the child and a finding that modification would

be in the child’s best interest. N.C. Gen. Stat. § 50-13.7 (2017); Fla. Stat. § 61.13(2)(c)

(2017).

 However, in both North Carolina and Florida, the burdens for modifying

regular custody orders are dependent on whether the order is “temporary” or

“final.” See Simmons v. Arriola, 160 N.C. App. 671, 674, 586 S.E.2d 809, 811 (2003);

Jones, 674 So. 2d at 774. Florida, unlike North Carolina, has a special proceeding for

granting “temporary” custody of a child to an “extended family member” for the

purposes of recognizing “that many minor children in this state live with and are well

cared for by members of their extended families” because the “parents of these

children have often provided for their care by placing them temporarily with another

family member who is better able to care for them.” Fla. Stat. § 751.01(1) (2007) (part

of an act (the “Act”) entitled: “Temporary Custody of Minor Children by Extended

Family”). Through the Act, parents can relatively easily transfer both legal and

 - 35 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

physical custody of their children to certain relatives. Fla. Stat. § 751.05 (2007). The

Act also provides a simple method for parents to regain full custody of their children

– filing the appropriate petition to terminate the custody order and demonstrating to

the court that they are “a fit parent,” or demonstrating that all parties to the order

consent to return of custody to the parent. Fla. Stat. § 751.05(6). It is through the

procedures set forth in the Act that, with the consent of both Plaintiff and Carter,

legal and physical custody of E.R.Q. was transferred to Defendant. North Carolina

has no legislation similar to the Act.

 ii. Failure to Preserve Issues

 We first hold that Plaintiff has failed to preserve the issues of full faith and

credit or what law controls for appellate review. Plaintiff’s Action was initiated by

Plaintiff’s Motion to modify the Florida Order. Plaintiff’s Motion expressly and solely

requested the remedy of modification pursuant to North Carolina law, specifically

N.C.G.S. § 50-13.7. During the ensuing three and a half years, which culminated in

a ten-day trial, additional hearings, and entry of the Bickett Order, Plaintiff sought

modification of the Florida Order pursuant to N.C.G.S. § 50-13.7, and never gave the

trial court any indication she believed the matter should be considered pursuant to

Florida law. After her motion to modify the Florida Order was denied by the Bickett

Order, Plaintiff filed her Rule 59 “Motion for New Trial.”

 As discussed above, Plaintiff’s Rule 59 motion was not valid. Nonetheless,

Plaintiff purported to request a new trial on the basis of, inter alia, the following: “the

 - 36 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

verdict is contrary to law, [and there were] errors in law occurring at trial and

objected [to] by [] Plaintiff[.]” Plaintiff’s language, “errors in law occurring at trial

and objected [to] by [] Plaintiff[,]” tracks the language of Rule 59(a)(8).

 In order to obtain relief under Rule 59(a)(8), a defendant
 must show a proper objection at trial to the alleged error of
 law giving rise to the Rule 59(a)(8) motion. Neither
 defendant’s post-trial motion nor the remaining record
 before us shows a proper objection at trial to any of the
 rulings at issue. Nothing else appearing, from the record
 before us, defendant failed to preserve his right to pursue
 a Rule 59(a)(8) motion.

Davis v. Davis, 360 N.C. 518, 522–23, 631 S.E.2d 114, 118 (2006). None of the other

Rule 59 grounds for a new trial referenced in Plaintiff’s motion are applicable to

Plaintiff’s choice of law argument. The “verdict is contrary to law” language, which

tracks part of Rule 59(a)(7), refers to a verdict rendered after a proper proceeding,

but that is still in some manner unlawful. See, e.g., Matter of Will of Leonard, 71 N.C.

App. 714, 718, 323 S.E.2d 377, 380 (1984) (citation omitted) (grant of a new trial was

proper based upon unlawful verdict because “[t]he jury cannot find both for the

plaintiff and the defendant on the same issue”). Plaintiff’s arguments that the trial

court did not give full faith and credit to the Florida Order, and applied the wrong

law, were issues of law that Plaintiff was required to object to prior to or during trial.

Davis, 360 N.C. at 522–23, 631 S.E.2d at 118. Because Plaintiff did not object based

upon those issues at trial, those issues were not properly preserved as arguments for

Plaintiff’s Rule 59 motion for a new trial, and the trial court erred in considering

 - 37 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

them. Id.; Barnett v. Security Ins. Co. of Hartford, 84 N.C. App. 376, 380, 352 S.E.2d

855, 858 (1987).

 Absent a proper objection at trial, Plaintiff has also failed to preserve these

issues for appellate review.

 In order to preserve an issue for appellate review, a party
 must have presented to the trial court a timely request,
 objection, or motion, stating the specific grounds for the
 ruling the party desired the court to make if the specific
 grounds were not apparent from the context. It is also
 necessary for the complaining party to obtain a ruling upon
 the party’s request, objection, or motion.

N.C. R. App. P. 10(a)(1). Plaintiff did not simply fail to object to the trial court’s

application of N.C.G.S. § 50-13.7 at trial, she affirmatively and solely requested relief

pursuant to N.C.G.S. § 50-13.7. Plaintiff may not base an appeal on an alleged error

that she invited. Frugard v. Pritchard, 338 N.C. 508, 512, 450 S.E.2d 744, 746 (1994)

(a party has no right to appeal invited error: “A party may not complain of action

which [s]he induced”) (citations omitted). This argument is therefore dismissed on

these bases as well.

 iii. Merits

 We further hold that the rulings in the Bickett Order gave full faith and credit

to the Florida Order and properly applied the law of North Carolina. Plaintiff argues:

“‘Full Faith and Credit shall be given in each State to the public Acts, Records, and

Judicial Proceedings of every other State.’ U.S. Const. art. IV, § 1.” However, the

United States Supreme Court has “declined expressly to settle the question” of

 - 38 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

whether “custody orders [a]re sufficiently ‘final’ to trigger [the] full faith and credit

requirements” of U.S. Const. art. IV, § 1. Thompson v. Thompson, 484 U.S. 174, 180,

98 L. Ed. 2d 512 (1988) (citations omitted). The Court in Thompson reasoned:

 Even if custody orders were subject to full faith and credit
 requirements, the Full Faith and Credit Clause obliges
 States only to accord the same force to judgments as would
 be accorded by the courts of the State in which the
 judgment was entered. Because courts entering custody
 orders generally retain the power to modify them, courts in
 other States were no less entitled to change the terms of
 custody according to their own views of the child’s best
 interest. For these reasons, a parent who lost a custody
 battle in one State had an incentive to kidnap the child and
 move to another State to relitigate the issue. This
 circumstance contributed to widespread jurisdictional
 deadlocks . . ., and more importantly, to a national
 epidemic of parental kidnaping.

Id. at 180, 98 L. Ed. 2d at 521 (citations omitted). Congress attempted to address

this issue by enacting the PKPA, thereby severely limiting the circumstances in

which a state could exercise jurisdiction to modify a custody order properly entered

in another state:

 Once a State exercises jurisdiction consistently with the
 provisions of the [PKPA], no other State may exercise
 concurrent jurisdiction over the custody dispute, §
 1738A(g), even if it would have been empowered to take
 jurisdiction in the first instance, and all States must accord
 full faith and credit to the first State’s ensuing custody
 decree.

Id., at 177, 98 L. Ed. 2d at 518-19. The PKPA created a statutory requirement that

states afford full faith and credit to custody orders initially entered in a different

 - 39 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

state. This full faith and credit requirement is not based upon U.S. Const. art. IV, §

1, the Full Faith and Credit Clause. Id., at 181, 98 L. Ed. 2d at 521 (“[t]he context of

the PKPA therefore suggests that the principal problem Congress was seeking to

remedy was the inapplicability of full faith and credit requirements to custody

determinations”); In re Craigo, 266 N.C. 92, 95, 145 S.E.2d 376, 378 (1965) (Full Faith

and Credit Clause does not apply to custody orders); Williams v. Walker, 185 N.C.

App. 393, 400, 648 S.E.2d 536, 541 (2007).

 As discussed above, because of the unique nature of child custody

determinations, our Supreme Court has recognized that the rules governing regular

civil foreign judgments are different than those governing child custody orders. Both

Florida law and the terms of the Florida Order allowed modification of the Florida

Order by the Florida court – so long as that court retained jurisdiction. The Florida

Order awarded custody of E.R.Q. to Defendant conditioned upon the following

relevant provisions: (1) Defendant “is awarded temporary physical and legal custody

of . . . [E.R.Q.], until the child turns 18 years old or the parents petition for

modification of custody under Section 751.05(7), Florida Statutes” and, (2)

“RESERVATIONS: The [Florida court] retains jurisdiction to enforce or modify the

terms of this final judgment as may, from time to time, become necessary.” (Emphasis

added).

 As our Supreme Court held under similar circumstances, since the trial court

in North Carolina had obtained jurisdiction, it could

 - 40 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 consider any change or circumstances that [arose] since the
 entry of the Florida decree . . ., and [it could] determine
 what [was] for the best interest of the child and [] award
 custody accordingly. But, in disposing of the custody of the
 minor child in controversy, the Florida decree awarding
 her custody to the petitioner is entitled to full faith and
 credit as to all matters existing when the decree was entered
 and which were or might have been adjudicated
 therein. “[W]here a decree . . . fixing the custody of the
 children . . . is rendered in accordance with the laws of
 another state by a court of competent jurisdiction, such
 decree will be given full force and effect in other states as
 long as the circumstances attending the rendition of the
 decree remain the same. The decree has no controlling
 effect in another state as to the facts and conditions arising
 subsequent to its rendition.”

In re Marlowe, 268 N.C. 197, 199–200, 150 S.E.2d 204, 206–07 (1966) (emphasis

added);8 Spence v. Durham, 283 N.C. 671, 683–84, 198 S.E.2d 537, 545 (1973); Spoon

v. Spoon, 233 N.C. App. 38, 44, 755 S.E.2d 66, 71 (2014). Further, in another case

procedurally similar to the present case, our Supreme Court reasoned:

 Since this is a case involving modification of a custody
 order entered with the consent of both parties by a court in
 California, the controlling statute is N.C.G.S. § 50-13.7.
 That statute provides in pertinent part:

 [W]hen an order for custody of a minor child has been
 entered by a court of another state, a court of this State
 may, upon gaining jurisdiction, and a showing of
 changed circumstances, enter a new order for custody
 which modifies or supersedes such order for custody.

 8 The jurisdictional rules set forth in the UCCJEA supersede prior jurisdictional rules.
However, the fact that a court with jurisdiction can always modify a custody order, whether from this
State or another, upon a showing of substantially changed circumstances and in accordance with the
best interests of the child, remains the law of this State.

 - 41 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 N.C.G.S. § 50-13.7(b) (1995).

Pulliam v. Smith, 348 N.C. 616, 624, 501 S.E.2d 898, 902 (1998).9 In Pulliam our

Supreme Court did not look to California law to determine whether modification of

the existing California consent custody order was warranted, it applied the standard

mandated by N.C.G.S. § 50-13.7(b).

 It is true that the Florida Order granted custody to Defendant pursuant to a

procedure not found in North Carolina, and that the Florida Order provided for

modification of its terms by the procedure set forth in Fla. Stat. § 751.05. However,

once the trial court in North Carolina obtained jurisdiction, it had the authority to

modify the Florida Order; based upon findings of substantial change in circumstances

affecting E.R.Q. and that modification would be in E.R.Q.’s best interest. Pulliam,

348 N.C. at 624, 501 S.E.2d at 902. Full faith and credit, as well as the UCCJEA,

required that the trial court recognize and enforce the custody determination made in

the Florida Order – that Defendant had legal and physical custody of E.R.Q., and that

any attempt to deprive Defendant of custody, absent modification of the Florida

Order, would be in derivation of the UCCJEA, but only so long as the Florida Order

was not validly modified or vacated.10 Once the trial court obtained jurisdiction, it

could only modify the Florida Order pursuant to N.C.G.S. § 50-13.7(b). This does not

mean that the trial court was free to ignore the Florida Order, but the terms and

 9 N.C.G.S. § 50-13.7(b) has been amended to clarify that modification is “[s]ubject to the
provisions of G.S. 50A-201, 50A-202, and 50A-204” of the UCCJEA.
 10 Again, excepting for emergency jurisdiction provisions as set forth in N.C.G.S. § 50A-204.

 - 42 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

intent of the Florida Order had to be considered based upon the circumstances in

existence when that order was entered, and further considered within the context of

everything that had transpired after entry of the Florida Order. The trial court has

broad discretion with respect to custody matters, and is expected to consider all

relevant factors when making any custody determination. Assuming, arguendo,

Plaintiff’s arguments were properly before us, we would reject Plaintiff’s arguments

concerning jurisdiction, full faith and credit, and application of North Carolina law to

Plaintiff’s Action, and affirm the trial court’s denial of Plaintiff’s Motion.

 c. Conduct Inconsistent with Protected Status as a Parent

 Plaintiff argues that the trial court erred in finding and concluding “by clear

cogent and convincing evidence that [] Plaintiff [] acted inconsistently with her

constitutionally protected status to parent her child.” We disagree.

 “[W]e review [a] conclusion [that the natural parent’s conduct was inconsistent

with her constitutionally protected right] de novo, and determine whether it is

supported by ‘clear and convincing evidence.’” Boseman v. Jarrell, 364 N.C. 537, 549,

704 S.E.2d 494, 502 (2010) (citations omitted).

 “[T]here is no bright line beyond which a parent’s conduct
 meets this standard. As we explained in Price [v. Howard,
 346 N.C. 68, 79, 484 S.E.2d 528, 534 (1997)], conduct rising
 to the ‘statutory level warranting termination of parental
 rights’ is unnecessary. Rather, ‘[u]nfitness, neglect, and
 abandonment clearly constitute conduct inconsistent with
 the protected status parents may enjoy. Other types of
 conduct . . . can also rise to this level so as to be
 inconsistent with the protected status of natural

 - 43 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 parents.’”

Id. at 549–50, 704 S.E.2d at 503 (citations omitted).11 “[A] natural parent’s execution

of a valid consent judgment granting exclusive care, custody, and control of a child to

a nonparent, may be a factor upon which the trial court could base a conclusion that

a parent has acted inconsistently with his or her constitutionally protected

status.” Yurek v. Shaffer, 198 N.C. App. 67, 77, 678 S.E.2d 738, 745 (2009) (citations

omitted); see also Adams v. Tessener, 354 N.C. 57, 61-62, 550 S.E.2d 499, 502 (2001)

(when a parent voluntarily relinquishes custody to a non-parent for a significant

period of time, this may constitute a basis for making a determination that the parent

has acted inconsistently with her constitutionally protected status).

 As our Supreme Court has determined:

 [T]he United States Supreme Court has also recognized
 that protection of the parent’s interest is not absolute. . . . .
 The Court pointed out its traditional adherence to the
 principle that “the rights of the parents are a counterpart
 of the responsibilities they have assumed.” In discussing
 this principle, the Court stated:

 Thus, the “liberty” of parents to control the education of
 their children that was vindicated in [prior opinions]
 was described as a “right, coupled with the high duty,
 to recognize and prepare [the child] for additional
 obligations.” The linkage between parental duty and
 parental right was stressed again . . . when the Court
 declared it a cardinal principle “that the custody, care
 and nurture of the child reside first in the parents,
 whose primary function and freedom include

 11 When a natural parent loses her constitutionally protected status, custody of a child as
between that parent and a non-parent is decided using the best interest of the child standard as stated
in N.C. Gen. Stat. § 50–13.2(a) (2017). Price, 346 N.C. at 84, 484 S.E.2d at 537.

 - 44 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 preparation for obligations the state can neither supply
 nor hinder.” In these cases the Court has found that the
 relationship of love and duty in a recognized family unit
 is an interest in liberty entitled to constitutional
 protection.

 In Lehr, the Court stressed the linkage between parental
 duty and parental right and noted that the father in that
 case had “never had any significant custodial, personal, or
 financial relationship with [the child], and he did not seek
 to establish a legal tie until after she was two years old.”
 The Court reasoned that

 [w]hen an unwed father demonstrates a full
 commitment to the responsibilities of parenthood by
 “com[ing] forward to participate in the rearing of his
 child,” his interest in personal contact with his child
 acquires substantial protection under the Due Process
 Clause. At that point it may be said that he “act[s] as a
 father toward his children.” But the mere existence of
 a biological link does not merit equivalent
 constitutional protection.

 The Court further stated, “‘[T]he importance of the familial
 relationship, to the individuals involved and to the society,
 stems from the emotional attachments that derive from the
 intimacy of daily association, and from the role it plays in
 “promot[ing] a way of life” through the instruction of
 children as well as from the fact of blood relationship.’”

Price, 346 N.C. at 76–77, 484 S.E.2d at 533 (citations omitted).

 In Boseman, our Supreme Court discussed Price, stating:

 Thus, under Price, when a parent brings a nonparent into
 the family unit, represents that the nonparent is a parent,
 and voluntarily gives custody of the child to the nonparent
 without creating an expectation that the relationship
 would be terminated, the parent has acted inconsistently
 with her paramount parental status.

 - 45 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

Boseman, 364 N.C. at 550–51, 704 S.E.2d at 503 (citations omitted). In Boseman,

upon the parent-mother’s initiation, she and a nonparent boyfriend were jointly

raising the child and participating equally in parenting decisions – resulting in a

stable, long-term family unit. “As such, the natural parent created along with the

nonparent a family unit in which the two acted as parents, shared decision-making

authority with the nonparent, and [by their actions] manifested an intent that the

arrangement exist indefinitely.” Id. at 551, 704 S.E.2d at 504; see also Id. at 552, 704

S.E.2d at 504.12

 Although the Florida Order was “temporary” and included a provision whereby

Plaintiff could regain custody pursuant to a simplified process, absent specific action

taken by Plaintiff, Defendant was granted full legal and physical custody of E.R.Q.

until E.R.Q. reached adulthood. We hold that Plaintiff’s actions – and failure to act

– after she “voluntarily [gave] custody of [E.R.Q.] to [Defendant],” Id. at 550–51, 704

S.E.2d at 503 (citations omitted), satisfies the requirement that Plaintiff did not

“creat[e] an expectation that the relationship [between Defendant and E.R.Q.] would

be terminated” at some point in the future. Id. at 550-51, 704 S.E.2d at 503. We base

 12 “[W]e recognize that there are circumstances where the responsibility of a parent to act in
the best interest of his or her child would require a temporary relinquishment of custody, such as
under a foster-parent agreement or during a period of service in the military, a period of poor health,
or a search for employment. However, to preserve the constitutional protection of parental interests
in such a situation, the parent should notify the custodian upon relinquishment of custody that the
relinquishment is temporary, and the parent should avoid conduct inconsistent with the protected
parental interests. Such conduct would, of course, need to be viewed on a case-by-case basis, but may
include failure to maintain personal contact with the child or failure to resume custody when able.”
Price, 346 N.C. at 83–84, 484 S.E.2d at 537 (emphasis added).

 - 46 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

our holding in part on Plaintiff’s lack of meaningful interaction with E.R.Q. for a

period of years, and on the fact that, other than the Florida action Plaintiff filed in

2009 then abandoned, Plaintiff failed to make any formal attempt to regain custody

of E.R.Q. for over six years.

 Further, in Boseman, Price, and other opinions cited therein, the biological

parent continued to “act as a parent,” exercising control and providing support, but

also decided to share those parental rights and obligations with a nonparent. In the

present case, Plaintiff completely relinquished her parental responsibilities to

Defendant for a period of years, and the only familial bond that occurred during those

years was between Defendant and E.R.Q. Price, 346 N.C. at 76–77, 484 S.E.2d at

533-34.

 We wish to make clear that Plaintiff’s voluntary relinquishment of custody to

Defendant pursuant to the Florida Order, standing alone, should not in any manner

be considered an act contrary to her protected status as a parent. The Florida

statutes provide that option for a salutary purpose, and the use of those statutes for

voluntary temporary relinquishment of custodial rights no doubt demonstrate acts of

parental love and responsibility in most instances. Plaintiff’s recognition that

Defendant was in a better position to care for E.R.Q. at the time Plaintiff consented

to entry of the Florida Order is presumed by this Court to have been an act of parental

responsibility. However, Plaintiff’s actions subsequent to entry of the Florida Order

reflect either a lack of ability, or desire, to take on even minimal continuing acts of

 - 47 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

parental love or responsibility. Our Supreme Court has “emphasized that evidence

of a parent’s conduct should be viewed cumulatively.” Owenby v. Young, 357 N.C.

142, 147, 579 S.E.2d 264, 267 (2003). The fact that Plaintiff, after years of inaction,

eventually decided to make a concerted effort to regain custody of E.R.Q. should be

considered in the analysis, but weighed in light of the many years in which Plaintiff

fully relinquished her parental duties to Defendant. The relevant evidence presented

in this case is exhaustively examined above, and we need not revisit it.

 We hold, upon de novo review, that the determination that Plaintiff’s conduct

had been inconsistent with her constitutionally protected status as a parent was

supported by clear and convincing evidence. Boseman, 364 N.C. at 549, 704 S.E.2d

at 502; Owenby, 357 N.C. at 147, 579 S.E.2d at 268. The Bickett Order is affirmed

and reinstated.

 B. Defendants’ Appeal

 1. Jurisdiction to Enter the Randolph Order

 Defendant argues that Judge Randolph lacked subject matter jurisdiction to

enter the 17 November 2016 Randolph Order. We agree.

 We first recognize that once the district court obtains jurisdiction over a child

custody matter, that jurisdiction continues until the child reaches the age of majority,

or some other factor serves to divest the district court of jurisdiction. See N.C.G.S. §

50A-202; Beck v. Beck, 64 N.C. App. 89, 93, 306 S.E.2d 580, 582 (1983). Judge

Bickett’s recusal did not affect the continuing jurisdiction of the trial court over the

 - 48 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

subject matter of this action. However, the trial court may still lack jurisdiction to

act in certain circumstances – for instance, as discussed below, when the matter is on

appeal. As we discussed above in determining that Plaintiff had failed to timely file

her notice of appeal from the Bickett Order, Plaintiff’s purported Rule 59 motion for

a new trial was not a proper Rule 59 motion.13 Therefore, Plaintiff never presented

any proper Rule 59 motion to the trial court, and the trial court never obtained

jurisdiction over the subject matter of Plaintiff’s purported Rule 59 motion. See

Meehan v. Cable, 135 N.C. App. 715, 721, 523 S.E.2d 419, 423 (1999). Absent

jurisdiction to hear Plaintiff’s Rule 59 motion, the trial court could not enter any valid

order deciding Plaintiff’s motion. In re J.H., __ N.C. App. __, __, 780 S.E.2d 228, 233

(2015).

 In addition, the Randolph Order was heard “on [] Plaintiff’s Motion for New

Trial, filed in response to the May 16, 2016 [Bickett] Order.” In Plaintiff’s motion for

a new trial, she limited the bases for granting a new trial to those set forth “pursuant

to Rule 59 of the N.C. Rules of Civil Procedure[.]” It is axiomatic that “[o]ne superior

court judge may not overrule another.” Able Outdoor, Inc. v. Harrelson, 341 N.C. 167,

169, 459 S.E.2d 626, 627 (1995) (citations omitted). However, “[i]f Judge [Bickett] did

not have jurisdiction to act . . ., his order was a nullity and Judge [Randolph] could

strike it.” Id. This Court has specifically held that a judge who did not hear a case

 13 See section II., A., 1. of this opinion.

 - 49 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

may not hear a Rule 59 motion for a new trial. Sisk v. Sisk, 221 N.C. App. 631, 636,

729 S.E.2d 68, 72 (2012) (judge who did not preside at trial “was without jurisdiction

to enter an order on plaintiff’s motion for new trial” pursuant to Rule 59).

 Because we have held that Judge Bickett did have jurisdiction to enter the 16

May 2016 order, it was error for Judge Randolph to consider Plaintiff’s 23 May 2016

motion for a new trial. “[A] judge who did not try a case may not rule upon a motion

for a new trial. Judge [Randolph] was without jurisdiction to hear [P]laintiff’s Rule

59 motion for a new trial.” Sisk, 221 N.C. App. at 633, 729 S.E.2d at 70 (citations

omitted). Because Judge Randolph lacked subject matter jurisdiction to hear

Plaintiff’s Rule 59 motion, the Randolph Order is void. Plaintiff argues that the rule

in Sisk should not apply because Judge Bickett recused himself from participating in

Plaintiff’s Action. Plaintiff cites no authority for this position. It is true that a

different judge than the one who presided at a trial may step in and perform certain

acts – such as entering the order of the prior judge – pursuant to N.C. Gen. Stat. §

1A-1, Rule 63 (2017). See In re Savage, 163 N.C. App. 195, 197, 592 S.E.2d 610, 611

(2004). However, this Court has held that “[t]he function of a substitute judge under

[Rule 63] is ‘ministerial rather than judicial.’” Id. (citation omitted). “Rule 63 does

not contemplate that a substitute judge, who did not hear the witnesses and

participate in the trial, may nevertheless participate in the decision making process.

It contemplates only . . . [performing] such acts as are necessary under our rules of

procedure to effectuate a decision already made.” Id. at 198, 592 S.E.2d at 611

 - 50 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

(citations and quotation marks omitted). The trial court lacked jurisdiction to hear

and decide Plaintiff’s Rule 59 motion for a new trial on the two separate bases

discussed above. We therefore vacate the 17 November 2016 Randolph Order.

 2. Additional Issues

 We take this opportunity to stress that a court without subject matter

jurisdiction can do nothing more than recognize its lack of jurisdiction and make

rulings that are directly consequent to that determination. Any additional action

taken would be a nullity and unenforceable. However, because the orders of a trial

court are not likely to be ignored, the trial court should strive to avoid confusion by

refraining from including findings, conclusions, or decretal statements that lack legal

effect. Had the trial court been correct in ruling in the Randolph Order that it lacked

subject matter jurisdiction, it would have therefore lacked jurisdiction to make any

additional substantive rulings. Subject matter jurisdiction is a prerequisite to any

binding judicial determination. Therefore, it was improper for the trial court, after

determining that it lacked subject matter jurisdiction, to conclude “that there exist

sufficient grounds under . . . Rule 59 to warrant a new trial, if this [c]ourt obtains

subject matter jurisdiction. This [c]ourt should give Full Faith and Credit to Florida

law.” It was equally improper for the trial court to decree that “Plaintiff’s Motion for

a New Trial is granted, if Florida releases subject matter jurisdiction to North

Carolina[,]” and that “Florida law applies to the interpretation of” the Florida Order.

See Town of Tryon v. Duke Power Co., 222 N.C. 200, 22 S.E.2d 450, 453 (1942).

 - 51 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 III. COA17-1344

 Defendant, by separate appeal in COA17-1344, appeals from the 2017 Order –

Judge Randolph’s 28 March 2017 “Child Custody Order.” Defendant argues that the

trial court lacked jurisdiction to enter the 2017 Order. We agree.

 “An appeal is not ‘perfected’ until it is docketed in the appellate court, but when

it is docketed, the perfection relates back to the time of notice of appeal, so any

proceedings in the trial court after the notice of appeal are void for lack of

jurisdiction.” Romulus v. Romulus, 216 N.C. App. 28, 33, 715 S.E.2d 889, 892 (2011)

(citation omitted). It is well established:

 When an appeal is perfected as provided by this Article it
 stays all further proceedings in the court below upon the
 judgment appealed from, or upon the matter embraced
 therein, unless otherwise provided by the Rules of
 Appellate Procedure; but the court below may proceed upon
 any other matter included in the action and not affected by
 the judgment appealed from.

N.C. Gen. Stat. § 1-294 (2017). There are certain exceptions to this rule:

“Notwithstanding the provisions of G.S. 1-294, an order pertaining to child custody

which has been appealed to the appellate division is enforceable in the trial court by

proceedings for civil contempt during the pendency of the appeal.” N.C. Gen. Stat. §

50-13.3 (2017) (emphasis added).

 Subsequent to Defendant’s 16 December 2016 filing of her notice of appeal in

COA17-675, which was perfected, Plaintiff filed a 4 January 2017 “Verified Motion in

the Cause to Terminate Order for Temporary Custody” (the “Verified Motion”) in

 - 52 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

which Plaintiff requested termination of the Florida Order “pursuant to Ch.

751.05(6), Florida Statutes.” The trial court heard arguments on the Verified Motion

on 14 March 2017, and then entered the 2017 Order. In the 2017 Order, the trial

court concluded that it “should give Full Faith and Credit to Florida law” and decide

the matter based upon Florida law. The 2017 Order purported to terminate the

Florida Order, and award full legal and physical custody of E.R.Q. to Plaintiff.

 Plaintiff makes several unavailing arguments in support of her contention that

the trial court had jurisdiction to enter the 2017 Order even though the Bickett Order

and the Randolph Order were on appeal in COA17-675. Plaintiff argues that the

language in N.C.G.S. § 1-294 that an appeal “stays all further proceedings in the court

below upon the judgment appealed from, or upon the matter embraced therein,” does

not apply in this matter because the issues decided in the 2017 Order were not

“matters embraced” by the Bickett and Randolph Orders. However, in order to reach

its ruling in the 2017 Order, the trial court had to “affirm” its own 17 November 2016

order – the Randolph Order – by implicit rulings that (1) Judge Bickett lacked subject

matter jurisdiction to enter the Bickett Order pursuant to the UCCJEA; (2) it had the

authority and jurisdiction to rule on Plaintiff’s Rule 59 motion; (3) Plaintiff had not

forfeited her constitutionally protected status as a parent; (4) Plaintiff’s conduct had

not served to alter the original nature of the Florida Order; (5) Florida law controlled

the North Carolina trial court’s authority to modify the Florida Order, even after

North Carolina obtained subject matter jurisdiction pursuant to the UCCJEA; (6) a

 - 53 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

North Carolina trial court can modify a custody order from another state without any

finding of changed circumstances or a determination of whether modification would

be in the best interest of the child – N.C.G.S. § 50-13.7(b) notwithstanding; and (7)

that Plaintiff’s motion for a new trial should be granted. See Carpenter v. Carpenter,

25 N.C. App. 307, 308-09, 212 S.E.2d 915, 916 (1975) (the purpose of N.C.G.S. § 1–

294 is to prevent the trial court from deciding the very matters that were embraced

in a previous order). Our resolution of the appeal in COA17-675 includes holdings

directly contrary to each of these implied rulings of the trial court in the 2017 Order.

 Further, this Court has clearly held that an appeal from an order involving

child custody removes jurisdiction from the trial court to consider any issues related

to custody of the child involved:

 We find that the district court lacked the authority to issue
 the 31 October 1986 and 3 November 1986 orders, and,
 conclude that these orders are null and void for the
 following reason.

 N.C.G.S. § 1-294 states in part:

 When an appeal is perfected as provided by this Article
 it stays all further proceedings in the court below upon
 the judgment appealed from, or upon the matter
 embraced therein; but the court below may proceed
 upon any other matter included in the action and not
 affected by the judgment appealed from.

 It is established that “[v]isitation privileges are but a lesser
 degree of custody.” As a result, the 5 March 1986 order,
 extending visitation rights, appealed by defendant is
 directly related to and will affect the 31 October 1986 and
 3 November 1986 orders determining custody, issued by

 - 54 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 the trial court. Therefore, N.C.G.S. § 1-294 removed
 jurisdiction on the issue of custody from the district court
 in the present case.

 Furthermore, the Supreme Court in Joyner v. Joyner, 256
 N.C. 588, 124 S.E.2d 724 (1962), specifically addressed the
 question of who has jurisdiction over a minor child when a
 custody matter is pending on appeal. In Joyner, the Court
 concluded that “North Carolina cases fit into the general
 rule that appeal removes the entire proceeding to the
 [appellate] Court and leaves the [lower] court functus
 officio until the cause is remanded.”

 Consequently, under both statute and case law the district
 court lost jurisdiction over all custody matters in the
 present case when defendant appealed the 5 March 1986
 visitation order.

Hackworth v. Hackworth, 87 N.C. App. 284, 286–87, 360 S.E.2d 472, 472-73 (1987)

(citations omitted);14 see also Rosero v. Blake, 150 N.C. App. 250, 252–54, 563 S.E.2d

248, 250–51 (2002), rev’d on other grounds, 357 N.C. 193, 581 S.E.2d 41 (2003).

 Plaintiff argues “[i]t is logical that a ‘matter’ wherein the Court of North

Carolina [sic] has subject matter jurisdiction is a separate ‘matter’ from one in which

North Carolina does not have subject matter jurisdiction.” The issue of subject matter

jurisdiction was one of the central issues on appeal in COA17-675, which is enough

to defeat Plaintiff’s argument. Plaintiff’s argument is further discredited by the fact

that her assumption that this Court would determine that the trial court lacked

 14 The adoption of the provision in N.C.G.S. § 50-13.3 to allow a trial court to enforce custody
orders pursuant to its contempt powers did not “overrule” Joyner, as Plaintiff argues. It simply created
a new, specific, and limited right. The general principle acknowledged in Joyner survives, as evidenced
by Hackworth and other opinions citing Joyner for this principle subsequent to adoption of the relevant
provision in N.C.G.S. § 50-13.3.

 - 55 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

jurisdiction to enter the Bickett Order in the COA17-675 appeal was not only an

improper assumption to make, but incorrect as well.

 Because prior orders involving the custody of E.R.Q. – the Bickett Order and

the Randolph Order – were on appeal in COA17-675, the trial court was without

jurisdiction to hear or decide any issues directly related to E.R.Q.’s custody during

the pendency of the COA17-675 appeal. Carpenter, 25 N.C. App. at 309, 212 S.E.2d

at 916 (citations omitted) (“[P]ending the appeal the trial judge is functus officio.

Therefore, the [trial c]ourt in the present case had no jurisdiction to hear and pass

upon defendant’s motion filed on 19 November 1974 while the appeal of this case was

pending in the Court of Appeals.”). Because the matter of E.R.Q.’s custody was on

appeal when the trial court entered the 2017 Order, that order is void and of no effect.

 From the evidence included in the record concerning the 2017 Order, it appears

E.R.Q. was erroneously removed from Defendant on 2 April 2017 by a court without

jurisdiction to do so. This Court now holds that custody of E.R.Q. was never properly

removed from Defendant and, based on our holdings, legal custody of E.R.Q.

continues to reside with Defendant, and physical custody of E.R.Q. must be returned

to Defendant.

 IV. Visitation

 Of the orders appealed in COA17-675 and COA17-1344, only the Bickett Order

survives – the Randolph Order and the 2017 Order are void and vacated. We note

that though Defendant’s 8 January 2013 responsive pleading to Plaintiff’s initial

 - 56 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

motion in the cause – in effect, Defendant’s answer and counterclaims – “prayed” the

trial court order that “Defendant be given permanent custody of [E.R.Q.,]” and grant

Plaintiff “supervised visitation” with E.R.Q., it does not appear from the record that

the counterclaims in Defendant’s responsive pleading have been decided by the trial

court.

 Plaintiff and Defendant have thus far handled the issue of visitation in this

matter through temporary consent orders. Plaintiff and Defendant first “agreed on

a temporary modification of child custody pending trial,” and this agreement was

entered as a temporary consent custody order on 1 May 2013. That consent order

provided Plaintiff with certain visitation and other rights to which she had not

previously been legally entitled. Additional consent orders modifying

custody/visitation rights were entered prior to entry of the Bickett Order.

 Following entry of the Bickett Order – and Plaintiff’s motion for a new trial –

Plaintiff and Defendant again agreed on a modified visitation schedule, which was

entered as a “Temporary Custody Order” on 7 September 2016. The trial court

entered an order on 13 December 2016 in which it, with the agreement of Plaintiff

and Defendant, modified a visitation provision of the 7 September 2016 temporary

custody order. It further ruled that, “[e]xcept as modified herein, the Temporary

Custody Order filed 09/07/2016 remains in full force and effect, subject to the

contempt powers of the [c]ourt.” Defendant filed her notice of appeal from the

Randolph Order on 16 December 2016, and Plaintiff filed her notice of appeal from

 - 57 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

the Bickett Order on 19 December 2016. Therefore, these orders establishing a

visitation schedule were entered before jurisdiction over the matter was removed

from the trial court to this Court by appeal. N.C.G.S. § 1-294.

 Though the 2017 Order purported to “supersede[] and vacate all other North

Carolina Orders in this court file[,]” the 2017 Order is void and of no effect. Neither

Plaintiff nor Defendant have challenged the 13 December 2016 consent order on

appeal. Therefore, the visitation provisions included and incorporated into the 13

December 2016 consent order are the last visitation provisions agreed upon by

Plaintiff and Defendant and entered as a temporary consent custody order. Since the

2017 Order is a nullity, the 13 December 2016 consent order remains in effect until

it is modified, vacated, or made permanent by the trial court.

 V. Conclusion

 Based upon our holdings above, we reach the following dispositions: (1)

Although Plaintiff’s appeal could be dismissed for failure to timely file notice of appeal

from the 16 May 2016 Bickett Order, we grant certiorari sua sponte and address

Plaintiff’s arguments; (2) pursuant to our analyses above, we dismiss or reject

Plaintiff’s arguments on appeal and affirm the 16 May 2016 Bickett Order; (3) we

vacate the 17 November 2016 Randolph Order on two independent grounds – (a.)

Plaintiff’s purported 23 May 2016 Rule 59 motion for a new trial was insufficient to

confer subject matter jurisdiction on the trial court, and (b.) because Judge Bickett

had subject matter jurisdiction when he entered the Bickett Order, Judge Randolph

 - 58 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

could not “overrule” the Bickett Order and substitute his own judgment for the prior

judgment of Judge Bickett; (4) the Bickett Order is currently the controlling order in

this matter, and any actions taken by the trial court that conflict with the rulings in

the Bickett Order are rendered void and must be corrected; (5) the appeal in COA17-

675 divested the trial court of jurisdiction to consider Plaintiff’s Verified Motion,

therefore the 2017 Order appealed in COA17-1344 is void and vacated; (6) Pursuant

to the Bickett Order, legal and physical custody of E.R.Q. remains with Defendant as

initially directed by the Florida Order; (7) because physical custody of E.R.Q. was

improperly removed from Defendant, physical custody of E.R.Q. must be returned to

Defendant; (8) the trial court shall use its discretion in weighing Defendant’s right to

immediate physical custody against E.R.Q.’s welfare when determining when and

how to return E.R.Q. to Defendant’s physical custody, but the return of E.R.Q. to

Defendant’s physical custody shall not be unreasonably delayed; (9) because the 2017

Order is void, legal custody of E.R.Q. has remained with Defendant since entry of the

Florida Order, though the effect of entry of the 2017 Order was to deprive Defendant

of the rights attendant to her legal custody of E.R.Q.; therefore, Defendant’s right to

exercise her legal custodial rights shall be immediately restored, with the following

caveat; (10) the trial court may impose temporary restrictions on Defendant’s legal

custodial rights upon a determination that such restrictions are required to prevent

 - 59 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

unnecessary stress or hardship for E.R.Q.;15 (11) the visitation orders entered by the

trial court, culminating in the 13 December 2016 order, remain in effect until

modified or vacated by the trial court; (12) the trial court, preferably pursuant to a

consent agreement, shall establish a temporary visitation plan that best serves the

interests of E.R.Q. for the transition period prior to return of physical custody to

Defendant;16 (13) nothing in this opinion should be interpreted as interfering with

the continuing jurisdiction of the trial court over this matter, and the trial court shall

continue to resolve any custody-related issues that may arise, as long as they have

not been finally resolved by this opinion or prior valid orders of the trial court; (14)

the trial court may not revisit certain issues that have become the law of this case

including, but not limited to, the correct law to apply if modification of the Florida

Order is again sought, jurisdictional issues decided in this opinion, and prior rulings

of the trial court that have either not been challenged or that have been upheld on

appeal; and (15) that Plaintiff has lost her constitutionally protected status as a

parent is an issue that has been finally decided and that may not be revisited by the

trial court.

 15 By way of example only, and not intended to be binding or limiting on the discretion of the
trial court, the trial court could immediately transfer authority to make certain major decisions
involving E.R.Q. – e.g. major medical decisions, or other decisions likely to significantly impact
E.R.Q.’s physical, mental, or social welfare – to Defendant, but grant Plaintiff temporary authority to
make necessary day-to-day logistical decisions concerning E.R.Q. until transfer of physical custody is
achieved.
 16 Of course, as long as the trial court retains jurisdiction, it may revisit custody/visitation

issues concerning E.R.Q. when they are properly before the court.

 - 60 -
 QUEVEDO-WOOLF V. OVERHOLSER
 Opinion of the Court

 COA17-675: PLAINTIFF’S APPEAL DISMISSED, 16 MAY 2016 ORDER

AFFIRMED; 17 NOVEMBER 2016 ORDER VACATED; REMANDED. COA17-1344:

26 MARCH 2017 ORDER VACATED; REMANDED.

 Judge MURPHY concurs.

 Judge BRYANT concurs in result only.

 - 61 -